**Robert L. McDOWELL et al., Plaintiffs,**

**v.**

**James R. SCHLESINGER, Secretary of Defense of the United States, et al., Defendants,**

**Jackson County, Missouri, Intervenor-Plaintiff.**

**No. 75 CV 234 W-4.**

United States District Court, W. D. Missouri, W. D.

July 9, 1975.

Joseph E. Stevens, Jr., William H. Bates & Jack D. Rowe, of Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, Mo., for plaintiffs.

David M. Proctor, Jr., Asst. U. S. Atty., Kansas City, Mo., Capt. Robert Peters, U.S.A.F., Hq. USAF (TJAG) Washington, D.C., for defendants.

## FINDINGS AND OPINION

ELMO B. HUNTER, District Judge.

On November 22, 1974, the United States Air Force (USAF) announced a decision to accomplish a troop and civilian deployment transferring various units to Scott Air Force Base, Illinois (Scott). Included in this decision were the transfer of the Headquarters, Air Force Communications Service (AFCS) from Richards-Gebaur Air Force Base, Missouri (RGAFB) to Scott so that the AFCS could be realigned as a technical service under the Military Airlift Command (MAC), whose headquarters are located at Scott; the transfer to Scott of a squadron of C–130 aircraft presently deployed at Langley Air Force Base, Virginia (Langley); the transfer to Scott of the Environmental Technical Application Center (ETAC); and the transfer to Scott of a functional unit of the Defense Communications Agency, Western Hemisphere (DCA). As a result of these decisions, the USAF will transfer and relocate to Scott approximately 2,992 job positions, which, counting dependents, will result in the move to Scott and its surrounding area of approximately 10,000 persons. The majority of the individuals contemplated to be moved by the USAF are presently located at RGAFB, and attached to Headquarters, AFCS.

The complaint of plaintiffs Robert McDowell, Karyn McDowell, and Local 2127, American Federation of Government Employees (AFL–CIO) (Union) was filed on April 3, 1975. Jackson County, Missouri (County), within whose boundaries RGAFB is located, moved to intervene as a party plaintiff on April 10, 1975. That motion was sustained on May 12, 1975, the defendants filing no

objection to the motion. In substance, the complaints assert that the defendants failed to comply with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* (1970) (NEPA), and the regulations of the Department of Defense (DOD) and the USAF promulgated pursuant thereto, in the decision making process that ultimately resulted in the decision to effect the above-stated realignments, transfers, asd relocations. Plaintiffs request a judgment declaring that the defendants have failed to comply with NEPA, and preliminary and permanent injunctive relief prohibiting the USAF from proceeding with these transfers and realignments until such time as they do comply with NEPA. The ultimate relief requested is a declaration by this Court that the planned relocations and transfers constitute a major federal action significantly affecting the quality of the human environment, and the issuance of an injunction prohibiting the defendants from effecting these transfers and relocations unless and until an environmental impact statement is filed in compliance with the requirements of § 102(2)(C) of NEPA, 42 U.S.C. § 4332(C).

Defendants' answers to the complaint in essence deny that the provisions of NEPA, or of the Department of Defense (DOD) or USAF regulations thereunder were violated, and deny that these moves constitute a major federal action significantly affecting the quality of the human environment. In addition, both in their answers and by separate motions, defendants question, *inter alia,* the subject matter jurisdiction of this Court, the existence of a case or controversy in the constitutional sense, and the standing of all plaintiffs, including the County, to bring this action.

By agreement of all counsel and the Court, due to the exigencies of the situation and the necessity of quickly resolving this litigation, discovery and all other pretrial matters were expedited, and disposition of all pretrial motions was postponed until the trial of this cause upon the merits of the issues presented. Trial commenced on Thursday, May 22, 1975, and concluded on Wednesday, June 4, 1975, after the presentation of extensive testimony and documentary evidence. This Court thereafter sustained the motion of all plaintiffs to amend their pleadings to conform to the evidence adduced at the trial.[1]

On June 5, 1975, this Court announced its decision that the defendants had failed to comply with the requirements of NEPA, and that the planned relocations and transfers constituted a major federal action significantly affecting the quality of the human environment. A preliminary injunction was issued on that date prohibiting the defendants from effecting the planned relocations, transfers, and realignments until such time as they comply with NEPA, and until such time as they prepare and file an environmental impact statement and otherwise comply with § 102(2)(C) of NEPA. The preliminary injunction will expire on the filing of this memorandum opinion, and the filing of the final injunctive order.

### The Parties

Plaintiffs Robert McDowell and Karyn McDowell are husband and wife, and are both civilian employees of the USAF at RGAFB, which is located in the southern portion of the greater Kansas City, Missouri metropolitan area. As a result of the proposed move of the Headquarters, AFCS to Scott from RGAFB, these plaintiffs are faced with the ter-

1. On May 2, 1975, pursuant to the motion of plaintiffs, and pursuant to the record made in connection with that motion, a temporary restraining order was issued restraining the defendants from proceeding with the planned relocations for a period of ten days. The restraining order was extended on May 12, 1975, for an additional ten days, following a conference of counsel and the Court. Trial commenced on the date the restraining order expired.

mination of their present employment at RGAFB and the resulting choice of accepting similar positions at Scott or remaining in the Kansas City, Missouri area and searching for new employment. Plaintiff Local 2127 American Federation of Government Employees (AFL–CIO) (Union) is the recognized bargaining agent for some of the civil service employees at RGAFB, and asserts that some of its members will be affected by the proposed relocation of Headquarters, AFCS by either being required to move to the Scott area, or by having their job positions terminated.[2] Intervenor-plaintiff Jackson County, Missouri, a political subdivision of the State of Missouri within which RGAFB is located, contends *inter alia* that it will suffer a loss of population and tax revenue by the proposed relocations.

Defendants are the Secretary of Defense of the United States, the Secretary of the Air Force, the Air Force Chief of Staff, the DOD and the USAF. The DOD and USAF are agencies of the United States within the meaning of both NEPA and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (APA). As a group the defendants are charged by law with the accomplishment of certain functions of the Department of Defense and the Department of the Air Force, including mission changes, and troop and personnel deployments such as are in issue in this proceeding.

### Background of the Controversy

Scott Air Force Base is located in central St. Clair County, Illinois, approximately seven miles from the city of Belleville, Illinois, and approximately twenty-five miles east of the City of St. Louis, Missouri. Although the area surrounding Scott is primarily agricultural, a number of small municipalities lie within thirty miles of the base. Prior to July 1, 1970, the Headquarters, Air Force Communications Service was located at Scott. The AFCS is presently and was at that time a separate major command of the USAF. Its mission is to engineer, provide for and program for, install, operate, maintain, and manage the communications-electronics, meterological, and air traffic control facilities of the USAF; and to provide functional services with regard to NAVAID's (except airfield lighting), air traffic control, and flight inspection. In these capacities, the AFCS serves the USAF and other agencies as directed by the Chief of Staff of the USAF. While Headquarters, AFCS was at Scott, the total job authorizations at that base, including all military and civilian positions attached to any unit there located, was some 9,400 positions.

On July 1, 1970, the AFCS was combined by the USAF with the Ground Electronics Engineering Installation Agency (GEEIA), which was then located at Griffiss Air Force Base, New York (Griffiss). The combined headquarters operation of AFCS and GEEIA was on that date transferred from Griffiss and Scott to Richards-Gebaur Air Force Base, Missouri.

RGAFB is located in the extreme southern portion of the greater Kansas

---

2. The McDowells and the Union brought this action as a class action under Rule 23 F.R. Civ.P., seeking to represent the class of all "other Federal Government civilian employees in the . . . (AFCS at RGAFB) . . . ." As it appeared that at least the plaintiffs McDowell had standing to bring this action (see *infra* this memorandum opinion), and that if successful the relief granted to these plaintiffs would as a practical matter apply to the entire class they seek to represent, it was not necessary and this Court did not consider this case as proceeding as a class action. The procedural technicalities and delays that would have resulted from the preliminary determinations of the class action question would have delayed the resolution of this action. This Court does note, however, that the evidence at trial indicated that the McDowells were joined in their desire to challenge the USAF's proposed relocation of Headquarters, AFCS, and the related actions, on NEPA grounds by a substantial number of other civilian employees at RGAFB.

City, Missouri metropolitan area, approximately eighteen miles south of downtown Kansas City, Missouri, and approximately five miles east of the Kansas State line. Approximately one half of the base lies in extreme southwestern Jackson County, Missouri, with the other half lying in extreme northwestern Cass County, Missouri. Immediately surrounding the base in Jackson County is the city of Kansas City, Missouri, and within one mile is located the city of Grandview, Missouri. In Cass County, RGAFB is bounded by an unincorporated area on the west and by the City of Belton, Missouri on the east and south. Downtown Grandview and downtown Belton are both located within three miles of the base.

Lester W. Reed, Jr., is a Lieutenant Colonel (LTC) in the USAF who is and at all times relevant to this proceeding was assigned to Headquarters, United States Air Force, in the Pentagon, Washington, D.C. (hereinafter, the Air Staff) as a special assistant to the Division Chief and Director of Programs, Bases and Unit Division, under the Deputy Chief of Staff for Programs and Resources.[3] In this capacity he acts as a focal point for the formulation of recommendations on base and unit utilizations, including specifically base closures and unit realignments. With regard to the transfer of the four units in question (Headquarters AFCS, ETAC, DCA, and the squadron of C-130 aircraft) to Scott, he was the officer responsible for the coordination of studies and recommendations concerning these realignments and moves, and was the individual who made the decision that these moves and realignments did not constitute a major federal action significantly affecting the quality of the human environment, and that therefore an environmental impact statement was not required.

In general, in July and August of each year various proposals for changes in base utilizations and unit functions and locations begin to take shape within the Air Staff. As soon as any proposal is particularized to the point that a study on that proposal becomes feasible, LTC Reed begins to consider that proposal. To accomplish this task, an ad-hoc task force is created within the Air Staff at the Pentagon at which various divisions of the Air Staff are represented, i. e., manpower, budget, civil engineering, facilities, and environmental protection, etc. It is the function of this ad-hoc task force to evaluate the various proposals and options under consideration, including evaluating the environmental effects of any proposal. At a later date, if it appears that an option or proposal may be implemented, a formal process is begun to determine whether an environmental impact statement is required by § 102(2)(C) of NEPA, under specific DOD and USAF regulations.[4]

Generally, the process by which various proposals and options are studied and evaluated by the ad-hoc task force is placed in a "close-hold" status. Such a designation means that no one outside of the Air Staff task force considering the proposal and their superiors are advised that a transfer or realignment is under consideration. The public is not informed of the proposals under consideration, and normally not even the USAF base and unit commanders of the bases and units involved are made aware of the proposals being considered. The purpose of the "close-hold" procedure is to prevent unwarranted concern and speculation on the part of the public and USAF personnel with regard to proposals under study, as most of the proposals are never implemented; to prevent land speculation in the areas that would be affected by any proposed action; and to

---

3. LTC Reed's immediate supervisor is Colonel James Hines. He also works on a direct basis with Major General Greenleaf, who is Director of Programs.

4. DODD regulation No. 6050.1, 32 C.F.R. § 214.1 et seq. and Air Force Regulation No. 19-2. (Hereinafter, these will be referred to as DODD 6050.1 and AFR 19-2).

limit or eliminate public pressure in the course of the decision making process.

Sometime in August of 1974, LTC Reed was first advised that changes were being considered with regard to the Headquarters, AFCS, then based at RGAFB. In late September, he presented various broad options in this regard to General Jones, the Chief of Staff, and was instructed to further explore these options. On October 18, 1974, LTC Reed presented his first formal option to General Jones.[5] This option consisted of: (1) closing RGAFB totally; (2) relocating sixteen Air Force Reserve C–130 aircraft to Whiteman Air Force Base, Missouri (Whiteman); (3) relocating the AFCS Flight Checking Squadron to Scott or Keesler Air Force Base, Mississippi (Keesler); and (4) relocating Headquarters, AFCS, to either Scott or Keesler. This option estimated the ultimate dollar savings to the USAF at 21 million annually, with a savings of 10.5 million estimated for fiscal year 1976. At this time, the only comment made regarding impact on the communities involved was that the Kansas City area had an employment base of some 550,000 persons, and that the base closure would not increase the area-wide unemployment more than one percent. It was also noted that there was good potential for the use of RGAFB as a civilian airport.

General Jones responded by requesting that the option of moving Headquarters, AFCS to another base but retaining RGAFB as an operational base be evaluated, and directing that the realignment of AFCS as a technical service under the Military Airlift Command (MAC) at Scott be considered, as both services are world-wide in operation and scope of activity.

About this time, LTC Reed assembled the ad-hoc task force to work on the proposals involving the realignments and transfers from RGAFB to other installations. This task force was at the same time studying and evaluating numerous other realignments and transfers that had been proposed. Lieutenant Colonel Johan Bayer, a bio-environmental engineer attached to the office of the Director of Civil Engineering within the Air Staff, was the member of this task force assigned to evaluate and consider the environmental impacts, if any, of the proposed realignments and relocations.[6] The entire operation of this task force with regard to the realignments being considered relative to this proceeding was placed in a "close-hold" status.

On approximately October 26, 1974, LTC Reed directed LTC Bayer to evaluate the environmental aspects of the proposed moves from RGAFB on the basis of total closure of RGAFB only, and not on the basis of any partial closure or mission change with RGAFB remaining open in some limited capacity. LTC Reed made this determination to insure that the various proposals were evaluated as to their environmental impact on a "worst-case" basis, his belief being that any impacts resulting from partial closure and reduction in force at RGAFB would be less significant and less severe than the impact that would result from total closure.

On October 29, 1974, two revised options were presented to General Jones by LTC Reed, after Reed had had some discussions with various members of the ad-hoc task force concerning the available options. Option A consisted of closure of RGAFB, moving the C–130 aircraft to Whiteman or Scott, relocating Headquarters, AFCS to Scott, and realigning the AFCS as a technical service under MAC. With regard to impact upon the surrounding community, this option only advised General Jones that unemployment in the Kansas City area

---

5. These options were presented in the form of one page outline summaries.

6. LTC Bayer holds both a Master's and Ph D degree in "Industrial Health". He is fa-miliar with the requirements of NEPA and the DOD and USAF regulations promulgated pursuant to NEPA.

could be expected to increase one to two percent due to the closure.

Option B consisted of relocating Headquarters AFCS to Scott and realigning it as a technical service under MAC, relocating the AFCS Flight Checking Squadron at RGAFB to Scott or another unspecified installation, and limiting the USAF activity at RGAFB to the remaining units at that base. It is noted on this option that this proposal would increase unemployment in the Kansas City area by less than one percent. The cost of the proposed relocations is estimated at five million dollars, the savings for fiscal year 1976 is estimated at eight million dollars, and the ultimate yearly savings is estimated at sixteen million dollars. With regard to that portion of the moves to Scott relating to Headquarters AFCS, Option B was the option that was subsequently adopted by the USAF.

During this time period LTC Bayer was developing and writing a formal "Environmental Assessment" relative to the possible closure of RGAFB. The preparation of a formal, written environmental assessment is designed to collect and evaluate sufficient data to allow the responsible officer, here LTC Reed, to determine if the proposal is one for which an environmental impact statement is required under NEPA, DODD 6050.1, or AFR 19–2. Due to the "close-hold" restriction placed on the operations of the ad-hoc task force, LTC Bayer was limited in the sources of data available to him in compiling and writing this assessment. Essentially, he was limited to data previously compiled by the USAF and accessible at USAF headquarters in the Pentagon, and data contained in various public documents.

LTC Bayer first considered the data contained in the "Tab A" portions of the master plans for Scott and Richards-Gebaur. Tab A's of master plans generally contain data relating to the physical and meterological description of the base in question and its surrounding area, and a description of the facilities at the base. Included in this description are comments concerning the present status of on-base transportation and traffic conditions, on-base planned construction, on-base housing, base utility consumption (of power and water, etc.), base facilities for sewage treatment and disposal and base facilities for solid waste disposal.

Tab A's do contain slight comment concerning off-base facilities and conditions in a few instances. The Scott and RGAFB Tab A's upon which LTC Bayer relied for information were last updated in January of 1974, and were not prepared in consideration of any of the planned moves or relocations. The Tab A's are designed to indicate the adequacy of the facilities at a particular base to handle the existing base functions and personnel and to indicate problems in that regard. No attempt is made in these Tab A's to indicate the adequacy of base facilities to accommodate any large scale increase in personnel or major change in function. Similarly, little information is contained in these documents relating to the effect of the base on the surrounding communities.

In addition to the Tab A's, LTC Bayer also considered data obtained from the 1974 Edition of the *Editor and Publisher Market Guide*, the 1972 Edition of the *United States Bureau of the Census County & City Data Book*; various statistics compiled by the United States Department of Labor relating to employment, etc.; the analysis of the effects of closures of military installations reflected in the book *Local Economic Developments After Military Base Closures*, by Dr. John Lynch; and data contained in water pollution reports relative to Scott that were prepared in June of 1974. LTC Bayer was also aware, generally, that (1) Headquarters AFCS had been located at Scott prior to July 1, 1970, (2) that certain programs existed by which the federal government aided areas whose economies were affected by

military base closures to recover from the effects of such closures,[7] and (3) that the operation of the Homeowners Assistance Program of the DOD would aid individual homeowners transferred from the RGAFB area to the Scott area.[8]

The only environmental problem area identified by LTC Bayer in his study related to the availability of housing at Scott for the personnel being transferred to that base from RGAFB and other installations. This concern was occasioned by data contained in the Tab A to the Scott master plan which indicated that the housing situation at Scott and in the area surrounding Scott was "extremely critical". The Tab A information indicates that on base housing at Scott is for all intents and purposes completely filled, and that many military personnel, and all attached civilian personnel, must seek housing in the surrounding community. Rental housing in the surrounding community is categorized as "extremely scarce and expensive". For reasons therein stated, the Tab A concludes that the availability of single family dwellings for sale is "very limited" and includes only a "small percentage of the total housing". The Tab A summarizes the housing situation at and surrounding Scott as follows:

"Housing at Scott Air Force Base will continue to be a problem so long as the demand exceeds the supply by such a wide margin. Personnel turnover is such that off-base housing is more of a problem itself than a relief to the housing situation. The time required to acquire suitable off-base housing far exceeds the time personnel spend on an average tour of duty. Scott AFB has encountered several massive personnel increases without lateral increases in number of available housing units. Obviously, the housing deficiency has increased by leaps and bounds. Government furnished housing is the only solution to the problem."[9]

During the first week of November, 1974, LTC Bayer mentioned this potential problem area to LTC Reed, who contacted Colonel George Powers, Jr., Director of Programs, under the Deputy Chief of Staff, MAC, at Scott Air Force Base. Colonel Powers advised LTC Reed that in his opinion the Scott area had sufficient housing available to absorb the personnel being transferred to that area. This opinion was based totally on an estimate of the Housing Referral Office at Scott (made without any consideration of the influx of personnel due to the planned moves) that perhaps as many as 500 housing units were available in the Scott area on the Illinois side of the Mississippi River, and upon the fact that some portions of St. Louis, Missouri are located within a one hour driving distance of Scott.[10] Colonel Powers had done no studies and possessed no personal information relative to the housing situation at Scott. LTC Reed thereafter informed LTC Bayer that housing at Scott was "not a problem".

---

7. In July of 1970 President Nixon had created the Inter-Agency Economic Adjustment Committee, chaired by the Secretary of Defense, to aid communities in overcoming the economic effects of military base closures or reductions in force.

8. Public Law 89–754, Section 1013, as amended. This program can guarantee that homeowners will receive at least 95 percent of the fair market value of their home prior to the date of the announcement of the military base closure or force reduction.

9. This assessment was done in January of 1974 without considering the effect of the transfer and relocation to Scott of the Headquarters AFCS personnel, and the personnel attached to ETAC, the DCA unit, and the squadron of C–130's.

10. AFR 90–2, issued September 12, 1973, provides that, in general, housing that is located more than one hour commuting time from the base in question will not be considered in determining base housing needs. The standard for measuring the commuting time is whether the distance between the housing and the installation can be traversed by a privately owned vehicle in one hour or less, at peak traffic periods.

LTC Bayer completed the Environmental Assessment on or about November 13, 1974, and presented it to LTC Reed on that date. The first five pages of the Assessment constitute a review of the history and present physical facilities at RGAFB. The Assessment then states that the closure of RGAFB will result in (1) a reduction in air pollution and noise in the surrounding community; (2) a decrease in the demand made on community utility resources, including power, water, sewage disposal, and solid waste disposal; (3) a decline in Federal Aid to impacted school districts provided by Public Law 81–874, as amended; (4) a loss of as many as 6500 jobs in the surrounding community not including the civilian positions terminated at RGAFB, thereby raising the unemployment rate in the entire Kansas City metropolitan area by as much as 0.- 8 percent; and (5) that although it is difficult to measure, as the employment at RGAFB is less than fifteen percent of the total employment in the metropolitan Kansas City area, no measurable effect should be felt in the areas of retail sales and housing values. The only statements in the Assessment relating to the installation and areas to which the various units at RGAFB are to be moved are contained in two paragraphs on page eight of the Assessment, which read as follows:

"f. Mission Relocation. In order to meet operational requirements certain missions will have been relocated to other installations. In this instance, base missions are to be relocated to Whiteman AFG, MO and the Headquarters function to Scott AFB.

The bases to which the missions will be relocated will be chosen because operations can be efficiently conducted and the physical property accommodates the personnel and equipment with minor changes and little new construction. The sewage treatment facilities will be able to handle or will be programmed to handle the sewage that may be generated by the increase. The same is true for the heating and power generation facilities."

The Assessment further indicates that two alternatives to closure of RGAFB were considered. The first, "no action", is dismissed as not satisfying the need for economy in the USAF so as to more efficiently spend the defense dollar. The second, "close another installation", is rejected on the basis that RGAFB is one base at which economic gain would be realized by closure and all functions could be transferred to other installations.

The Assessment indicates that the only adverse impact of the closure of RGAFB that cannot be avoided is the economic impact on the surrounding community. The economic adverse effects are particularized in the assessment as

". . . unemployment, the reduction in market demands which will be very evident to the business community, reduced funding to community facilities, and economic development assistance programs, and the possible loss of Federal assistance to educational programs associated with large military populations in local communities."

No figures are presented in the Assessment to indicate the magnitude of any of these potential effects. The Assessment does contain a rather brief discussion of the purpose and programs of the President's Inter-Agency Economic Adjustment Committee, and states that past experience indicates that if local leaders will work with the Inter-Agency Committee, the adverse economic impact of a base closure can be eliminated or reduced "in many cases", within a maximum time of two and one-half years. Thus, LTC Bayer concludes in the Assessment, that if local leaders are willing to work with the Committee, specific adjustment programs can be promulgated and

". . . there is every reason to believe that the possible adverse economic impact of this action can be turned around. This will require the Air Force and the President's Committee to work with the community leaders to meet the challenges *of what could be considered a crisis. The Air Force and the Committee are ready to assist these community leaders to greatly reduce the potential environmental impact.*" (Emphasis supplied.)

The Assessment then concludes with the statements that the only impact that will be felt is a short-term economic impact, that the closure will not have any irreversible and irretrievable commitments of resources, and that "controversy" can be expected when the facts of the base closure and realignment of forces are made public.

After receiving the Assessment on November 13, 1974, LTC Reed, based upon the information and conclusions contained in the Assessment, some conversations he had had regarding the Assessment with LTC Bayer, his brief conversation with Colonel Powers concerning housing in the Scott area, and some conversations with Colonel Powers concerning the military feasibility of realigning the AFCS as a technical service under MAC, determined that the proposed action, closure of RGAFB, and transfer of the various units to Scott would not have a significant impact on the quality of the human environment, and that it was not highly controversial in its environmental aspects. Accordingly, LTC Reed decided that no environmental impact statement was required by NEPA, DODD 6050.1, or AFR 19–2, and that no candidate environmen-

tal statement would be prepared.[11] LTC Bayer concurred in this determination. Prior to making this decision LTC Reed was not provided by LTC Bayer with the data underlying the conclusions made in the Assessment. LTC Reed was aware, however, that prior to July 1, 1970 Headquarters, AFCS had been located at Scott.

Upon making his decision that no environmental impact statement was required, LTC Reed communicated this determination to his immediate superiors. From this point forward, no environmental impacts were considered in any way in the decision making process that ultimately led to the decision to transfer Headquarters, AFCS and the other units to Scott.

On November 16, 1974, the various options were reviewed with the Assistant Secretary of the Air Force and General Jones, and it was determined that Option B, as presented previously to General Jones, would be implemented, and that in addition the ETAC, and DCA units, and the Squadron of C–130 aircraft would be relocated to Scott. This determination was approved on November 18, 1974, by the Secretary of the Air Force and the Secretary of Defense. Various members of the Congress were notified of the realignments and relocations at issue in this proceeding, and of numerous other realignments and relocations, on November 21, 1974. The announcement was made to the public on November 22, 1974.[12]

Prior to the time that LTC Reed decided that no environmental impact study was required, and prior to the decision to effect the relocation of Head-

---

11. As will be more fully discussed *infra* in this opinion, a candidate environmental statement is the first step of a three step process by which the USAF writes formal environmental impact statements, under DODD 6050.1 and AFR 19–2.

12. The realignment of AFCS as a technical service under MAC, and the transfer of Headquarters, AFCS to Scott, along with

the other units being transferred to Scott, constituted the largest realignment and relocation in the group announced on November 22. A complete listing of all decisions made was forwarded to certain members of the Congress on November 21, 1974, along with a short synopsis of the reasons for the realignments of moves.

quarters, AFCS to Scott along with the other units, no study or evaluation was ever conducted as to the potential environmental impacts of the partial closure of RGAFB, which was the option the defendants adopted and now seek to implement. The only study that was done related to a total closure of the base.[13] Further, due to the "close-hold" nature of the decision making process, no local governmental officials or business or community leaders were contacted regarding the proposed actions in either the RGAFB or Scott areas prior to the decision being publicly announced on November 22, 1974. Hence, neither factual information nor general comments and concerns about the proposed relocations were sought or received by the defendants from any official of any local governmental body on the state, county, or municipal level in the RGAFB or Scott areas, including officials of local planning and zoning agencies, special utility districts, or school districts, etc., or from any community or business leaders. Nor was any attempt made to acquire information from military or civilian officials at either RGAFB or Scott who might be familiar with the surrounding communities and their relationship to the respective installation.

With particular regard to the RGAFB area, no study was done or data developed as to the magnitude of the economic impacts that would result from the proposed action, and no attempt was made to determine whether that impact would be spread across the greater Kansas City area or localized in the areas immediately surrounding the base, such as Grandview and Belton. No effort was made to determine whether the resulting unemployment would be concentrated in the areas immediately surrounding the base, and if so whether

such concentrated unemployment would have any other adverse effects on the quality of the human environment in those communities. No data was compiled from which it would be possible to determine whether the proposed actions would have any significant effect on existing community planning or zoning schemes, or whether there would be an impact on the overall community growth and development patterns in the area surrounding the base.

No effort was made to determine the housing patterns of the personnel at RGAFB that would be affected by the proposed actions. Hence, no data was collected by which it would have been possible to determine whether any particular community would be adversely affected by the loss of population due to the transfers away from RGAFB. Further, no consideration was given to the possibility of a large number of homes becoming vacant in a particular area for a significant amount of time if new buyers could not be found, with the attendant problems that may arise with large numbers of vacant homes, such as increased vandalism and related law enforcement problems, increased fire hazards, etc. Finally, no consideration was given to the possibility that the proposed action could decrease the tax base and tax revenues of various governmental bodies in the area, thereby potentially resulting in either a higher tax rate or a decrease in government services.[14]

Concerning the impact of the proposed realignments and transfers on the area surrounding Scott Air Force Base, the Assessment, as previously noted, is extremely terse and only states ultimate conclusions. No studies were conducted to determine the actual availability of housing in the Scott area to accommodate the incoming military and civilian

---

13. This is important for the reason that total closure of the base would leave the base area open for civilian uses and economic development, while partial closure of RGAFB would not make the base available for civilian uses.

14. Even though a local office of the President's Inter-Agency Economic Adjustment Committee is located in Kansas City, no attempt was made to contact that office relative to the potential problems that could result from the proposed actions.

personnel and their dependents. Further no attempt was made to measure or evaluate the potential impact of the incoming population on existing community resources and facilities, including transportation systems (and traffic conditions), power and water usage, sewage treatment and disposal, and solid waste disposal, etc. No investigation was made as to the potential effects on land use patterns or upon community growth and development patterns in the area.

Finally, it must be noted that in preparing the Environmental Assessment LTC Bayer found it neither necessary nor desirable (in light of the "close-hold" status of the proposed actions) to conduct any on-site inspections of either RGAFB and its surrounding communities, or of Scott and its environs. Similarly, LTC Reed found no reason to conduct any on-site investigations of these areas.

After the decision of defendants to effect the realignments and transfers in issue here, and subsequent to the public announcement of those actions, the Environmental Assessment prepared by LTC Bayer was updated on three separate occasions. None of these updates or the data underlying the updates was ever communicated to the decision makers. At no time did LTC Reed reconsider his determination that these actions did not significantly affect the quality of the human environment in light of the additional information contained in these updates. Nor was the decision to effect the proposed moves and relocations reconsidered in view of this additional data.

The first update was prepared in January of 1975 by LTC Bayer. Unlike the initial Assessment, this update does concern itself with the decisions that were made, and not with total closure of RGAFB, upon which the November As-

sessment had been predicated. This update basically amplifies the original Assessment in terms of unemployment in the RGAFB area resulting from the transfer of Headquarters, AFCS to Scott, and indicates that the Belton School District will lose approximately $30,000 yearly in federal impact-aid funds. Although the information in this update regarding the potential impact on the Scott area is just as limited as that in the original Assessment, the housing market in the Scott area is described as "limited" and possibly "a problem".

The March update, again prepared by LTC Bayer, further delineates the potential unemployment resulting from the transfer from RGAFB,[15] and for the first time incorporates data as to the present places of residence of RGAFB personnel with the metropolitan Kansas City area. This update states that the decrease in impact-aid funds to school districts will be approximately $739,000 for all school districts involved, and that this impact would be felt most strongly in the Belton School District.[16] The direct salary loss to the RGAFB area is placed at 35 million dollars, with an additional loss to the area of 52.5 million dollars in secondary income.

With regard to the Scott area, the March update indicates that the total cost of the move will be approximately 10 million dollars and that office facilities at Scott are sufficient to accommodate the increase of functions at that base. This Assessment, referring to an unidentified "comprehensive review" of off-base housing and public school facilities surrounding Scott, concludes that off-base housing is adequate in the area and that sufficient educational facilities, including institutions of higher learning, are present. With particular regard to housing, the Assessment does state that:

15. The unemployment resulting from the transfers is again predicated only as a percentage of the entire Kansas City metropolitan area. This update indicates that approximately 1,000 persons will lose their

jobs. This figure is approximately double the figure stated in the January update.

16. The update indicates the loss to Belton of approximately 380 students and $66,052.00.

"In addition to housing immediately available, the *local builders and developers already have numerous programs under way and have initiated plans for a significant number of additional units*. Their schedules are such that housing will be available by late summer. Although *the Air Force is not considering St. Louis proper as a housing resource for its people _ _ _* for those who wish to live in a metropolitan area, St. Louis will be well within the DOD distance criteria from Scott upon the completion of I–64 in the summer of 1976." (Emphasis supplied.)

The final update is entitled "Environmental Assessment on Increase of Functions, Scott AFB" and was prepared by personnel at Scott in late March or early April, 1975. In this Assessment for the first time are the potential environmental impacts of the proposed relocations to Scott of the four units involved considered and evaluated in anything more than a perfunctory and conclusory manner. This Assessment was prepared some four months after the final decision was made to effect the transfers and relocations to Scott, and was not before LTC Reed at the time that his decision not to prepare an environmental impact statement was made. This Assessment concludes that traffic flow will not be a problem after the transfers to Scott are effected; that although automobile related air pollution will increase, it should not increase over levels existing at Scott in 1969, prior to the original transfer of AFCS to RGAFB; but that the transfer of the C–130 aircraft to Scott will "increase substantially" the emissions of the "most harmful oxides of nitrogen and sulphur".

The maximum projected housing needs for incoming personnel is placed at 2,154 family units, and the Assessment concludes that enough housing is present to accommodate this need. In reaching this conclusion the Assessment points out the massive public relations campaign undertaken by USAF personnel at Scott after the transfer decisions were announced to locate every available housing unit, and the additional construction of housing units being undertaken in the surrounding communities in order to satisfy the housing deficiency engendered by the large personnel transfers to Scott contemplated by the proposed relocations of Headquarters, AFCS, ETAC, the DCA unit, and the Squadron of C–130 aircraft to Scott. No potential effects on local land use or growth and development patterns are mentioned. It is clear that in this Assessment parts of St. Louis, Missouri are considered as part of the Scott housing area.

In addition to the record of the administrative process, as summarized above, the testimony and other evidence adduced at the trial reveal the following. The realignment and relocation of Headquarters, AFCS from RGAFB to Scott will eliminate approximately 1,422 military job positions and 902 civilian job postions at RGAFB, of which approximately 1,049 military and 753 civilian positions will be transferred to Scott. The total cost to the USAF of the ralignments and relocations involved in this proceeding exceeds ten million dollars.[17] The direct salary loss to the RGAFB area will be approximately 35 million dollars annually, with a substantially higher secondary income loss. Unemployment in the greater Kansas City, Missouri metropolitan area will increase by 0.1%, from 6.9 to 7.0%.

The total number of job positions being transferred to Scott from RGAFB and other installations is approximately 2,992, which, with dependents, will result in the move of approximately 9 to 10 thousand persons into the communi-

17. It is unclear whether this figure relates only to the relocation of AFCS to Scott, or whether the costs of relocation of ETAC, the DCA unit, and the C–130 aircraft unit are also included.

ties around Scott. The total number of job authorizations at Scott after the relocations are effected will be approximately 9,970.[18] The relocations and transfers will be completed within fiscal year 1976, and approximately ninety percent of the incoming personnel will arrive at Scott between the first of July and the end of October, 1975.

The economic life of Belton and Grandview is directly tied to the individuals stationed at Richards-Gebaur. In large part due to the location and growth of RGAFB over the last fifteen to twenty years, Belton has grown from a community of 1,100 persons to its present population of over 15,000. Similarly, in the five years since the move of Headquarters, AFCS to RGAFB from Scott, the population of Grandview has grown from approximately 16,000 to over 26,000. The economic dislocations including the unemployment, resulting from the reduction in force at RGAFB will be particularly acute in these communities, and not spread out over the entire Kansas City, Missouri metropolitan area. For example, in Belton where a significant percentage of the work force is either employed at RGAFB or employed in secondary business directly serving the needs of the base and the individuals there stationed, the effect is expected by businessmen familiar with that community to be "devastating".[19]

The transfer of the Headquarters, AFCS operation from RGAFB to Scott will result in an immediate population decrease in the communities surrounding RGAFB of approximately 7,500 persons, including the loss of approximately 3,500 persons in Jackson County, Missouri. As a direct consequence of this rather sudden population decrease, the taxing authorities in the area will suffer an immediate and long term decrease in revenue from such sources as personal property taxes, sales taxes, business personal taxes, and gasoline taxes, etc. The evidence indicates, for example, that the surrounding communities will lose over $325,000 annually in revenue from personal property taxes on automobiles alone, with over $140,000 of this loss occurring in Jackson County. Similarly, substantial declines in revenues from sales and business personal taxes are expected, as the revenue from these sources is directly tied to the level of economic activity in the area.[20]

The transfer of personnel from RGAFB to Scott will also result in the placing on the open market for sale over 800 single family residences in the area immediately surrounding RGAFB within an extremely short period of time. Approximately 275 of these homes are located in Belton, with the large majority of the remainder located in Grandview.[21] This will create a "glut" on the housing market in these areas, resulting in a depression of property values and ultimately leading to a decrease in revenue from real estate taxes. These communities do not have the capacity to absorb this large number of vacant homes, and it is expected that a large percentage of them will remain vacant for an extended

18. Previously, in 1969, prior to the original move of Headquarters, AFCS from Scott to RGAFB, combined military and civilian job authorization at Scott totaled 9,400.

19. None of the individuals employed in secondary businesses serving the needs of RGAFB and its personnel will be among that group transferred to Scott.

20. The evidence does not support the finding of a precise figure for the yearly revenue lost from these sources. As noted, the direct salary loss to the RGAFB area due to the AFCS relocation will be approximately 35 million dollars annually. The secondary income loss figure to the area is placed as low as 52.5 million dollars (by defendants) and as high as 175 million dollars (by plaintiffs), per year.

21. The magnitude of this number of homes being placed on the market at one time in these areas (Belton, population approximately 15,000; Grandview pop. approx. 26,000) can be seen when it is noted that the total housing starts of single family dwellings in the entire Kansas City, Missouri metropolitan area (pop. approx. 1,350,000) has recently averaged only about 1600 units annually.

period of time, giving rise to increased vandalism and fire protection problems.[22] Further, the move of Headquarters, AFCS to Scott will result in an equivalent number of apartment units[23] being vacated in the area immediately surrounding RGAFB. Coupled with the large number of vacant homes, normal growth and development of the communities around RGAFB will be retarded a minimum of three years and a maximum of five years or longer, as it will take at least that amount of time before the vacated homes and apartments can be expected to become occupied by new residents. In the interim, it is expected that substantially no construction of residential or apartment housing will take place.[24]

The relocation of Headquarters, AFCS will also result in the departure from the RGAFB area of approximately 2,550 school children for which the school districts they have been attending in the RGAFB area are receiving federal funds under the federal aid to impacted areas program.[25] Most of the children currently attend school in Belton and Grandview.[26] At present, federal impact-aid funds received by public schools attended by children of military and civilian personnel stationed at RGAFB exceeds $1,800,000 annually. The transfer of personnel to Scott will ultimately result in a decrease of $700,000 or more per year in these funds, although the decrease will be gradual over a period of a few years, thereby lessening the immediate impact to some degree.

The evidence also indicates that the AFCS personnel that live in the Belton and Grandview areas have been extremely active in local government affairs and other community activities. In view of this fact, and in view of the foregoing, public officials and residents of the communities surrounding RGAFB are extremely concerned about the impacts the proposed realignment and relocation of Headquarters, AFCS to Scott will have on their communities.[27]

Concerning the area surrounding Scott Air Force Base, the evidence demonstrates that at present there is a severe shortage of family housing of all types, including homes for sale, homes for rent, and all types of apartment and other multi-family dwellings. What housing is available is expensive, considerably more so than comparable housing in the RGAFB area. This shortage will be severely aggravated by the influx of personnel attached to Headquarters, AFCS, and the other incoming units.[28]

22. The testimony indicates that a large portion of these homes will be taken over by the defendants under the Homeowner's Assistance program, and then transferred to the Department of Housing and Urban Development (HUD) for sale. Under this program, HUD will hold off the market enough of these homes to prevent a precipitous drop in property values in the area. However, the evidence indicates that vacant homes being offered for sale by HUD or held off the market until a later date are often not kept up and tend to become eyesores on the community.

23. Including townhouses and duplexes, etc.

24. In this regard the evidence also indicates that various utilities and other community services, such as parks and sewers, etc., have been planned on the assumption that RGAFB would remain at its present size and that the surrounding communities would continue to grow. For example, at least one utility company, the Missouri Public Service Company, has asked for a rate increase to offset the expected decrease in revenue flowing from the AFCS transfer.

25. Public Law 81–874 as amended.

26. Approximately 1000 attend in Belton and 875 in Grandview.

27. Many of the witnesses for the plaintiffs in this case indicated that without a detailed Environmental Impact Statement it would be impossible for them to predict with certainty the impacts resulting from the transfer. Also, it was indicated that an Environmental Impact Statement would be of great assistance in local government and community planning to offset the effects of the population decrease in these areas.

28. It is worth note that rentals are extremely scarce in the Scott area for families with children and/or pets.

Recognizing this problem, on December 2, 1974 Colonel Sharman R. Stevenson, then Base Commander at Scott, advised all unit commanders at Scott of the "immediate severe" nature of this problem, and requested them to remain in constant contact with the Housing Referral Office at Scott, which was then beginning to conduct a massive campaign to list every available housing unit in the Scott area for the information of the incoming personnel. That campaign has been ongoing constantly since that time, with some success. The expected large housing shortage has not been alleviated, however.

Overall, a minimum of 2,154 family housing units will be needed in the Scott area to accommodate the incoming personnel that will arrive by October 31, 1975. This number of units is not available in the Scott area, and will not become available in the foreseeable future. Viewing the evidence in the light most favorable to the defendants, an absolute maximum of 1,600 housing units will become available in the Scott area during this period, and this figure assumes that no one except incoming personnel stationed at Scott will need housing in the area during this time.[29] Further, these figures assume that every single housing unit in the area will be occupied.

The expected housing shortage for incoming military personnel and their dependents is particularly chronic, to the extent that the defendants have undertaken steps to allow the families of transferred military personnel to remain in their present housing at RGAFB for an extended period of time after the transfer to Scott, in the hopes that eventually housing will become available in the Scott area. Until that time, a shuttle service is contemplated by which the military personnel transferred to Scott would fly home to spend the weekends with their families, returning to Scott during the week. No similar service will be available for civilian personnel.

The campaign to identify available housing in the Scott area has also resulted in the beginning of some significant construction of new homes and apartments in the Scott area, with additional home construction being planned. Although the evidence does not indicate precisely the extent of such planned new housing, it is clear that much of this housing is intended to accommodate the personnel incoming to Scott. No attempt has been made by the USAF to determine whether this additional construction could have a significant effect on the quality of the human environment in the areas in which it is being undertaken.[30]

In this regard it is important to note that utilities in the Scott area are in some instances not able to accommodate the presently existing populations and housing facilities. Natural gas is unavailable in some portions of the area without a long waiting period. Similarly, certain of the local communities around Scott have suffered problems with their sewer systems, and with electric power supply.[31] Further, the entire area has a high water table, resulting in severe drainage problems in certain areas. Requests of contractors to have certain areas zoned for apartment construction have been challenged in some communities.

The transfers to Scott will also result in the local school systems being asked

29. These figures do not include the "South County" area of metropolitan St. Louis, Missouri, but do include all available housing units in the Illinois communities within an approximate one-hour driving distance from Scott. Whether the South County area is within one hour driving distance of Scott during peak traffic periods is, at best, debatable.

30. Within an approximate one hour driving distance of Scott are located eleven Illinois communities. Six of these (Columbia, Mascoutah, Lebanon, New Baden, Freeburg and Trenton) have a population of 5,000 or less, Edwardsville and O'Fallon a little over 10,000, Collinsville about 20,000, Belleville about 43,000 and East St. Louis near 70,000.

31. O'Fallon, Lebanon and Mascoutah for example.

to absorb an additional three to four thousand students annually. Surveys conducted by USAF personnel at Scott in the late Spring of 1975 indicate that the local school systems can absorb this absolute number of additional students. The evidence does not indicate whether those school systems with available space are located in the same communities in which housing is available.

*The National Environmental Policy Act*

In enacting the National Environmental Policy Act, Congress undertook (1) to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; (2) to promote efforts aimed at eliminating adverse environmental effects and stimulating the health and welfare of man; (3) to foster study and understanding of ecological systems and natural resources; (4) to establish the Council on Environmental Quality (hereinafter, CEQ). Section 2 of NEPA, 42 U.S.C. § 4321. The national environmental policy declared by Congress is as follows:

§ 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain

conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation an enhancement of the environment.

In order to effect these stated policies, Congress in enacting § 102 of NEPA, 42

U.S.C. § 4332, directed that, *to the fullest extent possible:*

"(1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

"(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

"(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unqualified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by Section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

"(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

. . . . . .

"(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;"

. . .

The purpose of the procedural requirements of § 102 is clear. The Congress had mandated that all federal agencies take environmental factors into consideration in all decision making. *Scherr v. Volpe,* 466 F.2d 1027 (7th Cir. 1972). The provisions of § 102 serve "to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in this fashion is it likely that the most intelligent, optimally beneficial decisions will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives, NEPA provides evidence that

the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own."

*Environmental Def. Fund v. Corps. of Eng.*, 470 F.2d 289 (8th Cir. 1972); *Calvert Cliffs Coordinating Committee v. U. S. Atomic Energy Commission*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

■■ NEPA's requirements are specifically designed to counter the inevitable agency bias in favor of a proposal or project that it has recommended, *Environmental Def. Fund v. Corps. of Eng.*, *supra*, and to effectuate substantive changes in the agency decision making process. *M.P.I.R.G. v. Butz*, 498 F.2d 1314 (8th Cir., En Banc, 1974). Agency determinations concerning the procedural requirements of NEPA are not committed to agency discretion by law within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701 (APA), and are therefore reviewable. *M.P.I.R. G. v. Butz, supra.* And see *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir. 1973).[32]

### Jurisdiction

This cause clearly arises under NEPA. Plaintiffs contend that the defendants have failed to comply with the spirit of NEPA, as set forth in § 101, and have failed to satisfy the procedural requirements of decision making set forth in § 102. In particular, plaintiffs assert *inter alia*, that the defendants failed to comply with §§ 102(2)(A, C, D, and F) in the decision making process that ultimately resulted in the decision to relocate Headquarters, AFCS and the other units to Scott. The amount in controversy exceeds $10,000, exclusive of interest and costs. This Court therefore has jurisdiction to hear this action under the provisions of 28 U.S.C. § 1331(a).[33] *Smith v. Schlesinger*, 371 F. Supp. 559 (C.D.Ca.1974); *Town of Groton v. Laird*, 353 F.Supp. 344 (D.Conn. 1972); *Citizens for Reid State Park v. Laird*, 336 F.Supp. 783 (D.Me.1972).

■ Further, this Court has jurisdiction to entertain this action under the provisions of 28 U.S.C. § 1361, as this action is one "in the nature of mandamus".[34] The ultimate issue presented in this case is whether the proposed realignments and relocations to Scott constitute a "major federal action significantly affecting the quality of the human environment". If so, defendants clearly have the duty under § 102(2)(C) to prepare and file an environmental impact statement prior to making the final decision to effectuate the realignments and relocations, and to otherwise comply with the mandates of § 102(2)(C). That duty is enforceable under the provisions of § 1361. See *Harlem Valley Transportation Association v. Stafford*, 500 F.2d 328 (2d Cir. 1974), and cases cited therein.[35]

### Standing

Defendants suggest that all plaintiffs lack standing to maintain this action. Accordingly, they assert that no case or controversy is present in the constitutional sense, and that therefore the complaints must be dismissed.

---

32. See also *Coalition for the Environment v. Volpe*, 504 F.2d 156 (8th Cir. 1974) at 161.

33. "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a).

34. "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

35. Venue is proper in this District under the provisions of 28 U.S.C. § 1391(e). Further, as no defendant has objected to venue any such objection has been waived. See Rule 12(h)(1) F.R.Civ.P.

The analysis of this contention must begin with § 10 of the APA, which provides as follows:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." § 10 of the APA, 5 U.S.C. § 702.

Standing under this section requires the satisfaction of a two-fold test: (1) the plaintiff must show that the challenged action has or will cause him injury in fact, and (2) that the alleged injury is to an interest " 'arguably within the zone of interests to be protected or regulated' by the statutes" that plaintiff claims the agency has violated. *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Coalition for the Environment v. Volpe*, 504 F.2d 156 (8th Cir. 1974); *M.P.I.R.G. v. Butz*, 498 F.2d 1314 (8th Cir., En Banc, 1974).

The requirement that a prospective plaintiff must suffer injury in fact assures that such plaintiff will have the personal stake and interest that impart the concrete adverseness required by Article III of the Constitution. The injury in fact requirement is therefore a limitation imposed on the jurisdiction of the federal courts by Article III of the Constitution, and without such injury in fact no case or controversy is present. See *Coalition for the Environment v. Volpe, supra*, 504 F.2d at p. 165, and cases cited therein.

Although injury to a plaintiff's economic well-being will satisfy the injury in fact requirement, other types of injury are sufficient to meet the requirements of this test. Specifically, a plaintiff may satisfy this requirement by showing injury to his aesthetic or environmental well-being, as these factors have been recognized as important ingredients in the quality of life in our society. *United States v. SCRAP, supra; Sierra Club v. Morton,*

*supra; Coalition for the Environment v. Volpe, supra.* And, although a plaintiff must show some injury, he need show no particular degree of injury. As recently stated by the Eighth Circuit:

"Standing is a threshold inquiry: it requires focus on the party seeking to have his complaint heard in a federal court; and it eschews evaluation of the merits. The court is not to consider the weight or significance of the alleged injury, only whether it exists. 'An identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.' " *Coalition for the Environment v. Volpe, supra*, 504 F.2d at p. 168.

And see *United States v. SCRAP, supra,* 412 U.S. 669, 689 at n. 14, 93 S.Ct. 2405.

Clearly, all plaintiffs here satisfy the injury in fact requirement. The plaintiffs McDowell face the choice of remaining in the RGAFB area and losing their present jobs, or of accepting the employment offers of the defendants at Scott. A move to Scott will entail some time and expense, and the evidence conclusively demonstrates that they will not be able to secure housing in the Scott area commensurate to their present housing without expending a considerable additional sum of money. They assert that the proposed relocation of Headquarters, AFCS away from RGAFB will have serious environmental impacts in the communities surrounding RGAFB, including, *inter alia,* a locally severe economic dislocation with resulting unemployment; increased problems of fire protection and law enforcement resulting from the large numbers of vacant single family dwellings and apartment units; increases in utility and tax rates; a severe retarding effect on the normal and expected development and growth patterns of the communities; and a decline in the ability of the school systems in the area to perform their function due to the decline in federal impact-aid funds.

With regard to the Scott area, to which the McDowells will move if they determine to accept the offer of defendants of new job positions at that installation, these plaintiffs assert that the arrival of the incoming personnel will completely overtax the ability of the surrounding communities to provide adequate housing, resulting in a severe shortage of available housing units; that available community resources, including utilities, sanitary sewer systems, and solid waste disposal systems, among others, will be overtaxed and unable to accommodate the increased usage; that traffic and air pollution problems will increase; and that the influx of personnel into the Scott area will engender construction of new housing units and other facilities to accommodate the new residents, with unknown and unstudied environmental consequences.

■ Such allegations as these constitute more than simple assertions of distaste, displeasure, or inconvenience. Rather, they are statements of specific injury to ascertainable individuals, i. e., these plaintiffs and other persons who live in the areas that plaintiffs assert will be affected by defendant's proposed action.[36] See *Coalition for the Environment v. Volpe, supra,* 504 F.2d at 167. The McDowells have alleged and demonstrated specific injury to their economic, aesthetic, and environmental well-being as a result of the proposed action.

Similarly, the Union has alleged and demonstrated injury in fact. The evidence indicates that some Union members will be transferred to Scott as a result of the proposed action, thereby decreasing Union membership. Further, the Union has demonstrated that some wage-grade employees at RGAFB, for whom it is the recognized bargaining agent, can be expected to lose their jobs as a result of the reduction in force at RGAFB.

■ Finally, the County has demonstrated injury in fact. It contends and has demonstrated: first, that it will suffer a decrease in tax revenue as a result of the relocation to Scott; second, that it will suffer a decrease in population, and third, that the quality of the human environment within the County will suffer for the reasons asserted by the McDowells. Further, as the County asserts that the proposed action is a major federal action significantly affecting the quality of the human environment, it contends that it has been injured in that it has been deprived of the right to have its comments and views on the impacts of the proposed action made known to the President, the CEQ, the public, and accompany an EIS through the decision making process so that these views and comments can be considered by the ultimate decision maker as provided by § 102(2)(C). In short, this contention is that the County has been injured as it has been deprived of the right granted to it by § 102(2)(C) of NEPA to have input into the decision making process. In this context, the County is asserting that one or more of its agencies (e. g., the County Department of Revenue, Department of Parks and Recreation, local special utility and sewer districts, and local planning and zoning agencies, etc.) are "local agencies . . . authorized to develop and enforce environmental standards" as provided by § 102(2)(C) of NEPA. Similarly, the County asserts that an EIS is required, and that such a statement would include "advice and information useful in restoring, maintaining, and enhancing the quality of the environment." As such, the County contends, it is absolutely entitled to such information under the provisions of § 102(2)(F) of NEPA, and is injured by

---

36. As the McDowells have established that they will personally suffer injury in fact due to defendant's proposed action, they may assert the general interest of the public in support of their claim that the defendants have failed to comply with NEPA's requirements. See *Sierra Club v. Morton,* 405 U.S. 727, 737, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *E.D.F. v. T.V.A.,* 468 F.2d 1164, 1172 (6th Cir. 1972).

**244**

not having such information made available to it due to the decision not to prepare and file an EIS. In view of these factors, it is clear that the County has satisfied the injury in fact requirement in this case.

Defendants assert, however, that even if plaintiffs do satisfy the injury in fact requirement, the injury suffered in this case is not within the zone of interests protected by NEPA. Essentially, defendants contend that so-called "secondary" social and economic impacts resulting from federal action, as contrasted to direct impacts on the ecology, do not fall within NEPA's ambit.

 In considering this contention, it is necessary at the outset to note that the sweep of NEPA is extraordinarily broad. NEPA mandates that *any and all types of potential environmental impact* be considered by the agency involved. See *Calvert Cliffs Coordinating Committee v. U. S. A. E. C.*, 146 U.S.App. D.C. 33, 449 F.2d 1109 (D.C.Cir. 1971) and *E. D. F. v. T. V. A.*, 468 F.2d 1164 (6th Cir. 1972). Further, the environmental considerations mandated by NEPA to be considered by federal agencies include both the direct and indirect effects of federal action. *M. P. I. R. G. v. Butz*, 498 F.2d 1314 (8th Cir., En Banc, 1974).

The Congressional declaration of policy contained in § 101 of NEPA is instructive in this regard. In part relevant to this proceeding, the Congress recognized in § 101(a) of NEPA

". . . the profound impact of man's activity on the interrelations of all components of the natural environment, *particularly the profound influences of population growth, high-density urbanization*, industrial expansion . . .."

and declared that

". . . it is the continuing policy of the Federal Government, *in cooperation with State and local governments*. . . . to use all practicable means and measures . . . in a manner calculated to foster and pro-

mote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and *fulfill the social, economic and other requirements of present and future generations of Americans.*" (Emphasis supplied.) § 101(a) of NEPA, 42 U.S.C. § 4331(a).

This policy is to be complied with by Federal agencies so that, among other things, "safe, healthful, productive, and esthetically and culturally pleasing surroundings" will be assured for all Americans; the widest range of beneficial uses of the environment can be obtained while the health and safety of individuals is maintained and undesirable and unintended environmental consequences are limited; and a balance between population and resource use can be obtained to "permit high standards of living and a wide sharing of life's amenities." § 101(b) of NEPA, 42 U.S.C. § 4331(b).

In order to effect these policies, the provisions of § 102(1) of NEPA require that the laws, policies and regulations of the United States be interpreted in accordance with the policies of § 101 *to the fullest extent possible.* Section 102(2) requires, *inter alia*, that agencies utilize a systematic interdisciplinary approach insuring the "integrated use of the *natural and social sciences*, and the environmental design arts" in all decision making and mandates that all agencies, in consultation with the CEQ, develop procedures to insure that *"presently unquantified environmental amenities and values"* are given appropriate consideration in the decision making process.

The CEQ Guidelines, 40 C.F.R. § 1500.1–1500.14, 38 Fed.Reg. 20550 (1973), also provide insight into the scope of NEPA. In discussing how a "major federal action significantly affecting the quality of the human environment" is to be identified, the guidelines provide as follows:

"(b) *Section 101(b) of the act (NEPA) indicates the broad range of aspects of the environment to be sur-*

*veyed in any assessment of significant effect.* The act also indicates that adverse significant effects include those that degrade the quality of the environment, curtail the range of beneficial uses of the environment, and serve short-term, to the disadvantage of long-term, environmental goals . . . . *Significant effects also include secondary effects,* as described more fully . . . (in guideline 1500.8). The significance of a proposed action may also vary with the setting, with the result that an action that would have little impact in an urban area may be significant in a rural setting, or vice versa . . . . (Examples of) effects to be considered in assessing significance include, but are not limited to, those outlined in Appendix II of these guidelines." (Emphasis supplied.) *40 C.F.R. § 1500.-6(b).*

. . . ."

Guideline 1500.8, entitled "Content of Environmental Statements", provides that agencies should take care to identify and assess the population and growth characteristics of an affected area so that "secondary population and growth" impacts may be given appropriate consideration. 40 C.F.R. § 1500.8(a)(1). This guideline further notes that agencies must consider the relationship of the proposed action to existing local land use plans, policies, and controls, etc. 40 C.F.R. § 1500.8(a)(2).

Of particular relevance to this proceeding, however, is the CEQ's definition of "secondary" impacts. Guideline 1500.8 provides in this regard as follows:

"Secondary, or indirect, as well as primary or direct, consequences for the environment should be included in the analysis. *Many major Federal actions, . . . stimulate or induce secondary effects in the form of associated investments and changed patterns of social and economic activities. Such secondary effects,* through their impacts on existing community facilities and activities, through inducing new facilities and activities, or through changes in natural conditions, *may often be more substantial than the primary effects of the original action itself.* For example, the effects of the proposed action on population and growth may be among the more significant secondary effects. Such population and growth impacts should be estimated if expected to be significant . . . and an assessment made of the effect of any possible change in population patterns or growth upon the resource base, including land use, water, and public services of the area in question." (Emphasis supplied). *40 C.F.R. § 1500.-8(a)(3)(ii).*

The CEQ Guidelines also indicate that among the factors to be taken into consideration in determining the environmental effects of a proposed federal action are the potential effects on solid waste disposal; noise; land use changes, planning, and regulation of land development; redevelopment and construction in built-up areas, population density and congestion; and impacts on low-income populations. Appendix II to CEQ Guidelines, 40 C.F.R. § 1500.1 et seq. at pp. 701–705.

■ From the above, it appears that so-called secondary, socio-economic effects do fall within the environmental effects of proposed action of which NEPA mandates agency evaluation and consideration. Indeed, the pertinent regulations of the DOD indicate the secondary socio-economic effects must be considered, and may be, in appropriate cases, significant.

DODD 6050.1, 32 C.F.R. § 214.1 et seq., 39 Fed.Reg. 14699 (April 26, 1974) "interprets and amplifies" the CEQ Guidelines, pursuant to the Congressional mandate of § 102(2)(B) of NEPA. 32 C.F.R. § 214.6(a)(4). This regulation clearly mandates that secondary, socio-economic impacts of proposed action must be considered in light of NEPA, and further indicates that while such

secondary impacts may be generally insufficient by themselves to significantly affect the quality of the human environment, so as to require an EIS, there are circumstances in which such impacts clearly mandates that secondary, socio- may be sufficient. 32 C.F.R. § 214.7(b)(2). Further, certain actions are required to be given "close environmental scrutiny," including

"Mission changes and troop developments which precipitate long-term population increases or decreases in any area, *with special attention to the secondary impacts which may cause indirect environmental impact.*" (Emphasis supplied.) 32 C.F.R. § 214.7(d)(7).

In this context, DODD 6050.1 mandates that effects on land use and management must be considered, including effects on population density and congestion, neighborhood character and zoning, hydrology and flood hazard, aesthetic qualities, and outdoor recreation. 32 C.F.R. § 214.7(c)(3). Finally, it must be noted that the DOD has essentially adopted the CEQ's definition of secondary impacts contained in Guideline 1500.8 (supra at p. 47). 32 C.F.R. § 214.8(d)(3)(ii).

Case law also clearly supports the proposition that NEPA encompasses more than direct, ecological impacts of proposed action. Noting the Congress' recognition in § 101(a) of NEPA of the effects of population growth and high-density urbanization, it has been held that NEPA's aims clearly extend beyond problems and effects of sewage and garbage disposal and air and water pollution to "include protection of the quality of life for city residents". Noise, traffic, congestion, overburdened mass transportation systems, crime, and congestion all effect the environment. *Hanly v. Mitchell,* 460 F.2d 640 (2d Cir. 1972). The effects of the proposed action on existing land use patterns and neighborhood character must be considered. *Hanly v. Kleindienst,* 471 F.2d

823 (2d Cir. 1972). NEPA's ambit extends to the effects of proposed action on neighborhood cohesiveness and character, population density, crime control, and aesthetic considerations. *Maryland National Cap. Pk. & Pl. Com'n v. U. S. Postal Service,* 159 U.S.App.D.C. 158 487 F.2d 1029 (D.C.Cir. 1973). As noted previously, *direct and indirect* environmental impacts on the quality of the human environment must be considered. *M.P.I.R.G. v. Butz, supra.*

In view of the express Congressional policy as evidenced in § 101 of NEPA, the CEQ Guidelines, the DOD regulations, and the existing case law, it cannot be seriously contended that the injuries complained of by plaintiffs McDowell and the County fail to "arguably" fall within the zone of interests protected by NEPA. These plaintiffs accordingly are able to maintain this action, having satisfied the two separate requirements necessary to establish standing. *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Coalition for the Environment v. Volpe,* 504 F.2d 156 (8th Cir. 1974); *M. P. I. R. G. v. Butz,* 498 F.2d 1314 (8th Cir. En Banc, 1974); *Smith v. Schlesinger,* 371 F.Supp. 559 (C.D.Cal. 1974); *Town of Groton v. Laird,* 353 F. Supp. 344 (D.Conn.1972); *Citizens For Reid State Park v. Laird,* 336 F.Supp. 783 (D.Me.1972). Also the County has standing on an alternative basis. § 101 of NEPA declares it the national policy for federal agencies to pursue environmental goals "in cooperation with State and local governments . . . ." To this end, § 102(2)(C) requires that the views of appropriate local agencies accompany an EIS through the decision making process. If the instant action is a major federal action significantly affecting the quality of the human environment (as plaintiffs suggest) so that an EIS is required by § 102(2)(C), the County has clearly been injured in that its opportunity to have its views on the

proposed action communicated and considered by the decision maker has been denied. This injury is to an interest specifically protected by § 102(2)(C) of NEPA.

As this Court has found the McDowells and the County to have standing to maintain this action, it is not necessary to consider whether the Union separately satisfies the standing requirements, and accordingly no opinion is expressed in that regard.[37]

### Compliance With § 102(2)(C)

NEPA is not only an environmental full-disclosure law, but is intended to effectuate substantive changes in decision making in federal agencies. *M. P. I. R. G. v. Butz*, 498 F.2d 1314 (8th Cir., En Banc, 1974); *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289 (8th Cir. 1972). The key, action-forcing provision of NEPA is § 102(2)(C). This section requires all federal agencies to include in every respect or recommendation on proposed legislation "and other major Federal actions significantly affecting the quality of the human environment" a *detailed* statement by the responsible official on:

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

In order to insure that the ultimate decision maker has before him a complete evaluation of the potential environmental impacts of a proposed action § 102(2)(C) also requires that prior to making any detailed statement under § 102(2)(C) (an EIS) the responsible official must consult with federal agencies having special familiarity with the particular impact involved, and give federal, state and local agencies involved with environmental concerns an opportunity to present their comments and views on the proposed action. Section 102(2)(C) further requires that the detailed EIS, along with the comments and views, of the appropriate federal, state, and local agencies accompany the proposal through the agency decision making process so that it may be considered by the ultimate decision makers.

In this case LTC Reed, on or about November 13, 1974, determined that the

---

**37.** It is worth note, however, that were the Union the only plaintiff in this proceeding, it would be questionable whether the injuries suffered by the Union are within the zone of interests protected by NEPA. The only injuries that will be suffered by the Union as the result of the proposed action are that (1) some civil service employees at RGAFB who are Union members, but for whom the Union is not the recognized bargaining agent, will cease to be members of the local Union by virtue of being transferred to Scott, or lose their jobs; and (2) that some wage-grade employees at RGAFB, for whom the Union is the recognized bargaining agent, will lose their jobs because of the reduction in force at RGAFB. These alleged injuries relate solely to the number of members in the Union, and to security for particular individuals with relation to particular jobs at RGAFB, and do not relate directly to any environmental concerns.

Unlike the plaintiffs in *Sierra Club v. Morton*, supra, or *M.P.I.R.G. v. Butz, supra*, the Union is not an organization devoted to the protection of environmental interests, but rather is committed to traditional union considerations relating to the job security and working conditions of its members, etc. While, as noted previously, the sweep of NEPA is extraordinarily broad it is highly doubtful whether NEPA was intended to protect the interests the Union asserts are injured by the proposed federal action.

It would seem clear, however, that individual union members living in the RGAFB area could establish standing to maintain this action on their own right, on a basis similar to that of the McDowells in this case.

proposed relocations and transfers of Headquarters, AFCS, and the other units involved to Scott did not constitute a major federal action significantly affecting the quality of the human environment. Accordingly, no EIS was prepared, and environmental considerations were not a part of the decision making process after that time. Within ten days the final decision to effect the proposed transfers and relocations to Scott had been made and publicly announced. That decision has never been reconsidered. Nor has LTC Reed's determination that the proposed action did not constitute a major federal action significantly affecting the quality of the human environment been reevaluated. Plaintiffs contend that the proposed relocations do constitute a major federal action significantly affecting the quality of the human environment, and that therefore the defendants violated § 102(2)(C) in proceeding with the decision to accomplish the proposed action without preparing an EIS and otherwise complying with that section.

Clearly, the key agency determination for the purposes of § 102(2)(C) is the threshold determination as to whether the proposed action is a "major federal action significantly affecting the quality of the human environment." If the agency determines that the proposed action does not constitute a major federal action significantly affecting the quality of the human environment, the detailed evaluation and consideration of the environmental impacts of the proposed action in the agency decision making process mandated by § 102(2)(C) is avoided. LTC Reed's decision that the proposed relocations herein involved did not meet that standard certainly had this result. No environmental factors were considered by the ultimate decision makers after his initial decision that any environmental impacts were insignificant.

The courts of appeal have not applied a uniform standard in reviewing threshold agency decisions that proposed actions are not major federal actions sig-

nificantly affecting the quality of the human environment. Some circuits hold that the threshold decision of an agency as to the applicability of § 102(2)(C) to a proposed action must be shown to be arbitrary and capricious or otherwise an abuse of discretion before that decision can be disturbed by a reviewing court. See, e. g., *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972); *First National Bank of Chicago v. Richardson,* 484 F.2d 1369 (7th Cir. 1973); *Arizona Public Serv. Comp. v. Fed. Power Comm.,* 157 U.S.App.D.C. 272, 483 F.2d 1275 (D.C. Cir. 1973); *Maryland-National Cap. Pk. & Pl. Comm. v. U. S. Postal Service,* 159 U.S.App.D.C. 158, 487 F.2d 1029 (D.C. Cir. 1973). Other circuits have concluded that the threshold determination of an agency that § 102(2)(C) does not apply to a particular proposed action must be kept within narrow limits and satisfy a reasonableness standard in order to effectuate the mandatory requirements and high standards of environmental consideration in agency decision making set by NEPA, and to prevent agencies from avoiding the requirements of § 102(2)(C) by threshold determinations against the applicability of this section that are too shielded from strict judicial scrutiny. See *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir. 1973), and *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir. 1973).

The Eighth Circuit has adopted this latter standard of review. In this Circuit, the threshold decision that a proposed action is not a major action significantly affecting the quality of the human environment is to be reviewed in terms of its reasonableness considering all of the relevant circumstances. This standard was set forth by Chief Judge Gibson in *M. P. I. R. G. v. Butz, supra,* as follows:

"Section 102(1) of the Act (NEPA) contains a Congressional direction that environmental factors be considered to 'to the fullest extent possible.' An initial decision not to prepare an

EIS precludes the full consideration directed by Congress. In view of the concern for environmental disclosure present in NEPA, the agency's discretion as to whether an impact statement is required is properly exercised only within narrow bounds. Action which could have a significant effect on the environment should be covered by an impact statement. We think that the threshold decision as to whether or not to prepare an EIS should be reviewed not on the arbitrary and capricious standard used to test a substantive decision which entails a balancing and weighing of alternatives already studied, but on the grounds of its reasonableness.

"An agency decision concerning NEPA requirements is not one committed to the agency's discretion by law within the meaning of the APA, 5 U.S.C. § 701 et seq. The Congressional command that agencies cooperate in attaining the goals of NEPA "to the fullest extent possible" requires the courts to look at the good faith efforts of the agency to comply. To upset an agency determination not to prepare an impact statement, it still must be shown that the agency's determination was not reasonable under the circumstances. This will require a showing that the project could significantly affect the quality of the human environment. . . . We therefore hold that review of an agency's determina-

tion not to prepare an impact statement should be measured by its reasonableness in the circumstances, not as to whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

*M. P. I. R. G. v. Butz*, 498 F.2d 1314, 1320 (8th Cir. En Banc, 1974).

By formal regulation the DOD and USAF have formalized the process by which these defendant agencies make threshold decisions as to the applicability of § 102(2)(C) to proposed actions. The individuals considering an action are to develop and write a formal "Environmental Assessment" in cases of action similar to the one herein involved. 32 C.F.R. § 214.7(d)(7) (DODD 6050.1) (26 April 1974); DODD 4165.12 (III–E) (23 July 1973); AFR 19–2, Attach. 1(3)(i) (22 Nov. 1974); an AFR 19–2, Attach. 1(3)(j) (20 Jan. 1972).[38] An assessment is not and is not intended to be the formal, detailed EIS required by § 102(2)(C), but is designed to allow the responsible officer to determine if the applicability of § 102(2)(C) is triggered by the proposed action. Cf. *M. P. I. R. G. v. Butz*, supra, 498 F.2d 1318 at n. 11. If after an assessment has been prepared it is determined that the proposed action is a major Federal action significantly affecting the quality of the human environment, these regulations require, in accordance with § 102(2)(C) of NEPA, that a formal EIS be prepared and filed, and accompany the pro-

38. 32 C.F.R. § 214.7(d)(7) requires that a written formal assessment be prepared in cases of "Mission changes and troop developments which precipitate long-term population increases or decreases in any area, with special attention to the secondary impacts which may cause indirect environmental impact." DODD 4165.12(III–E) requires a formal written assessment in cases of base closure, inactivation, and major military realignments. AR 19–2, Attach. 1(3)(i) (1974) requires assessment for mission changes and troop deployments precipitating major long term population increases or decreases in any area. AFR 19–2, Attach. 1(3)(j) (1972) requires a formal assessment when population increases in an area threat-

en to tax the "environmental capability of the local civilian community."

It should be noted that DODD 6050.1, as amended in 1974, was in effect at all times relevant to this case. The previous DODD 6050.1, upon which the 1972 version of AFR–19–2 was based, was expressly cancelled by amended DODD 6050.1. See 32 C.F.R. § 214.10(p) (1974). Amended DODD 6050.1 clearly applies to the USAF. 32 C.F.R. § 214.2 The USAF did formally issue amended AFR 19–2 (1974), which implements and is patterned after amended DODD 6050.1, on November 22, 1974, the day on which the realignments here in question were announced.

posal through the agency decision making process.[39]

■ Although the precise factors that must be taken into consideration by an agency in making its threshold decision as to the applicability of § 102(2)(C) will vary to some degree with each proposed action, it is clear that in making this determination the agency is called upon to review in a general fashion the same factors that would be studied and evaluated in detail in an EIS, and the agency is required to do sufficient investigation to be able to determine the types and potential magnitude of environmental impacts that can be expected from the proposed action. Otherwise an agency might frustrate the purposes of NEPA by a threshold decision based upon insufficient information. *Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972). It is obvious that a determination that a proposed action would not significantly affect the quality of the human environment based upon clearly insufficient information would not only be an unreasonable decision, but would be arbitrary, capricious, and constitute an abuse of discretion. *Hanly v. Mitchell*, 460 F.2d 640 (2d Cir. 1972).

■ Certain general requirements for agency threshold determinations have been developed, however. The agency must identify all areas of potential environmental concern flowing from the proposed action, and must take a "hard look" at all potential impacts so identified, including secondary impacts. Sufficient investigation must be done and sufficient data gathered to allow the agency to consider realistically and in an informed manner the full range of potential effects of the proposed action. In making a negative determination as to the applicability of § 102(2)(C) to a particular project, the agency must avoid making "bald conclusions" as to

the magnitude or variety of potential effects of the proposed action. Similarly, the agency is not permitted to base a negative decision as to the applicability of § 102(2)(C) upon superficial reasoning or perfunctory analysis. Rather for an agency's threshold decision that § 102(2)(C) does not apply to a particular proposed action to be upheld in review, it must affirmatively appear from the administrative record, and from the written assessment where one is prepared, that the agency has given thoughtful and reasoned consideration to all of the potential effects of the proposed action, and that a convincing case has been made that the proposed impacts are insignificant after a careful balancing of the relevant factors. See, generally, *Hanly v. Mitchell*, 460 F.2d 640 (2d Cir. 1972); *Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972); *Arizona Public Serv. Comp. v. Federal Power Comm.*, 483 F.2d 1275 (D.C. Cir. 1973); *Maryland-National Cap. Pk. & Pl. Comm. v. U. S. Postal Service*, 159 U.S.App.D.C. 158, 487 F.2d 1029 (D.C. Cir. 1973); *First National Bank of Chicago v. Richardson*, 484 F.2d 1369 (7th Cir. 1973). In any event, the agency must consider

> "(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area."

*Hanly v. Kleindienst, supra; First National Bank v. Richardson, supra.*

■ In view of the above, it is evident that the decision of LTC Reed that the transfers and relocations of Headquarters, AFCS, and the other units in-

---

39. See 32 C.F.R. § 214.8 (1974). The USAF has by its regulations required a three-step process for the preparation of an EIS in compliance with § 102(2)(C). First, a "candidate" environmental impact statement is to be prepared, to be followed by a "draft" and then "final" impact statement. See AFR 19–2 (20 Jan. 1972) and AFR 19–2 (22 Nov. 1974).

volved to Scott did not constitute a "major federal action significantly affecting the quality of the human environment" was unreasonable. The Assessment prepared by LTC Bayer was substantially all the information before LTC Reed at the time that the decision was made. This Assessment, as previously noted, was not predicated upon partial closure of RGAFB, but rather upon total closure. Therefore, LTC Reed had no assessment before him dealing with the specific action that was later determined to be implemented.

As more fully set forth supra at pp. 15–23, the defendants (i. e., LTC's Bayer and Reed) clearly failed in this case to do preliminary investigation and data gathering sufficient to enable either of them, in November of 1974, to make a reasoned and considered determination as to the applicability of § 102(2)(C) to the proposed action. Although LTC Bayer did gather some data relative to the Scott area, LTC Reed, who made the decision that an EIS was not required, did not have this data before him. The data that was gathered and reflected in the Assessment relates exclusively to the RGAFB area, and can, at best, be described as extremely limited, and incomplete. It cannot be seriously contended that the data collected by LTC Bayer and reflected in the Assessment afforded either he or LTC Reed an opportunity to identify all areas of potential environmental impact, or to give these areas the informed "hard look" that is required. Clearly, as detailed supra at pp. 233–234, and 235–239 numerous areas of potential environmental impact resulting from the proposed action were not even identified, much less consid-

ered, by either LTC Reed or LTC Bayer. The question of potential environmental impacts on the area around Scott due to the relocation to that area of the AFCS and other personnel is not even mentioned in the Assessment.

In short, the decision of LTC Reed that the proposed action did not constitute a major federal action significantly affecting the quality of the human environment can only be fairly categorized as a "bald conclusion" reached after perfunctory and superficial analysis of clearly inadequate data. Neither the Assessment nor the administrative record support the conclusion that prior to the time LTC Reed made the negative determination that he gave thoughtful and reasoned consideration to all of the potential environmental effects of the proposed action, and that, after a careful balancing of the relevant factors, concluded for sound and convincing reasons that the potential environmental impacts were not significant. The administrative record and the Assessment require the opposite conclusion. LTC Reed's determination that the procedures set forth in § 102(2)(C) did not apply to the proposed action was clearly an unreasonable determination.[40]

▆▆▆ The evidence in this regard also demonstrates that the defendants *failed to comply with the provisions of §* 102(2)(A) of NEPA in the decision making process herein involved. This section requires that all federal agencies must "utilize a systematic, interdisciplinary approach" to insure that "the integrated use of the natural and social sciences and the environmental design arts" is employed in all decision making

40. Also, it is clear that this determination was arbitrary, capricious, and an abuse of discretion under the test set forth in *Hanly v. Mitchell, supra,* and *Hanly V. Kleindienst, supra.* Further, defendants have failed to comply with the provisions of the applicable DOD regulation. Under the terms of DOD 6050.1, the relocations that constitute the proposed action in this case require the defendants to assess the poten-

tial impacts of the action with "close environmental scrutiny" and "special attention to the secondary impacts which may cause indirect environmental impact." 32 C.F.R. § 214.7(d)(7). Keeping in mind the purposes of NEPA, the term "close environmental scrutiny" must be interpreted to require a far more searching study and evaluation of the potential impacts than was done in this case.

which may have an impact on the environment.[41] This section applies to all decision making of federal agencies concerning all agency actions, even where the provisions of § 102(2)(C) of NEPA are not applicable. CEQ Guideline 1500.6(c), 40 C.F.R. § 1500.6(c); *Hanly v. Kleindienst, supra; Harlem Valley Transportation Ass'n v. Stafford,* 500 F.2d 328 (2d Cir. 1974). Clearly, no interdisciplinary approach was employed.[42] LTC Bayer, whose speciality is "industrial health" was the only individual who even attempted to evaluate the environmental impacts that might result from the proposed action. No individual possessing expertise in any other discipline was consulted.[43]

Defendants assert, however, that the administrative record as it developed subsequent to November of 1974, and as it is reflected in the three updates to the original Assessment, demonstrates the reasonableness of LTC Reeds' initial determination that the proposed action was not a major federal action significantly affecting the quality of the human environment. On this basis defendants contend that plaintiffs should not be entitled to the injunctive relief they seek even if, as indeed this Court has found, the initial decision of LTC Reed concerning the applicability of § 102(2)(C)

to this proposed action was not reasonable considering all of the relevant circumstances. They further assert that plaintiffs have failed to show that the proposed action could significantly affect the quality of the human environment.

These contentions cannot be sustained. The provisions of § 102 of NEPA are procedural in nature. These provisions are specifically designed to insure that the policies specified by Congress in § 101 of NEPA are taken into consideration by all federal agencies in decision making, and to effect substantive changes in the agency decision making processes. *Environmental Def. Fund v. Corps of Eng.,* 470 F.2d 289 (8th Cir. 1972); *M. P. I. R. G. v. Butz, supra.* The Congressional mandate of § 102(1) that the provisions of § 102 be complied with by all agencies "to the fullest extent possible" sets a high standard of performance for federal agencies, and requires that these standards be rigorously enforced by a reviewing court. *Environmental Def. Fund v. Corps of Eng., supra,* at 470 F.2d 297 n. 12; *Calvert Cliffs Coordinating Committee v. United States A. E. C.,* 146 U.S.App.D. C. 33, 449 F.2d 1109 (D.C. Cir. 1971). *E. D. F. v. T. V. A.,* 468 F.2d 1164 (6th Cir. 1972). *Arlington Coalition on*

---

41. The full text of this section appears supra at p. 239.

42. LTC Bayer admitted as much during his testimony at the trial.

43. At this point some discussion of the "close-hold" procedures utilized by the USAF is warranted. The primary justification for this policy put forth by defendants is the public interest in preventing land speculation in the areas affected by the relocations. This same rationale would, of course, extend to almost every substantial federal action or project in the country.

Secrecy in the agency decision making process runs counter to the thrust of NEPA. NEPA is an environmental full-disclosure law. *M.P.I.R.G. v. Butz, supra.* The policies of NEPA as set forth in § 101 contemplate that decisions with environmental effects be made in cooperation with *state and local governments and concerned public*

*and private organizations.* Further, the "close-hold" procedure limits drastically the available sources of information to which an agency might turn in making the threshold decision as to the applicability of § 102(2)(C), and comments and input from individuals and groups who may well be in the best position to assess the effects of a proposed action. That was the result in this case.

As it is not necessary in the context of this opinion to determine whether public notice is a requirement prior to an agency making the threshold decision on the applicability of § 102(2)(C) to a proposed action, no opinion is expressed in that regard. But see *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972). It is important to note, however, that the utilization of a "close-hold" procedure cannot excuse agency failure to gather sufficient data to make the threshold decision as to the applicability of § 102(2)(C).

*Transportation v. Volpe,* 458 F.2d 1323 (4th Cir. 1972).

■ The Congressional mandate that both the spirit and letter of NEPA be complied with "to the fullest extent possible" requires that agencies reach substantive decisions on the merits of proposed actions only after a full, good faith consideration of environmental factors in light of NEPA. Substantive agency decisions on the merits must be set aside by a reviewing court if it is shown that the required good faith effort to comply with NEPA has not been made, or if it is shown that the actual balance of costs and benefits struck by the agency according to NEPA's standards was arbitrary, or gave insufficient weight to environmental factors. *Environmental Def. Fund v. Froehlke,* 473 F.2d 346 (8th Cir. 1973); *Environmental Def. Fund v. Corps of Eng., supra; Calvert Cliffs Coordinating Committee v. U. S. A. E. C., supra.* Without the full disclosure required by the procedures set forth in § 102 of NEPA for major federal actions, there exists no sound basis to evaluate the environmental aspects of a proposed action, and without this basis for evaluation, the Courts have no basis from which to determine if a substantive decision to proceed with a project is arbitrary in light of NEPA's policies. *M. P. I. R. G. v. Butz, supra.* Accordingly, where agency decisions are reached without compliance with the procedural requirements of § 102, it is the responsibility of the Courts to set that decision aside. "It is hard to imagine a clearer or stronger mandate to the Courts". *Calvert Cliffs Coordinating Committee v. U. S. A. E. C., supra.*

For these reasons, it is incumbent on this Court to protect the integrity of the fact finding processes set forth in § 102 of NEPA, and to require that these procedures be explicitly complied with by the agency involved, notwithstanding even a probability that the agency will reach the same substantive decision on the merits after compliance with NEPA as it reached originally. To do less would be to subvert the very purpose of § 102 and encourage administrative laxity in the future. *City of New York v. United States,* 337 F.Supp. 150 (E.D. N.Y.1972); *Hanly v. Mitchell,* 460 F.2d 640 (2nd Cir. 1972); *Jones v. Lynn,* 477 F.2d 885 (1st Cir. 1973); *Arizona P. S. C. v. Fed. Power Commission,* 157 U.S. App.D.C. 272, 483 F.2d 1275 (1973).

■ It is in this context that defendants' contention must be rejected. To suggest that defendants can satisfy NEPA's strict requirements on the basis of information gathered and studies done subsequent to the time that the final substantive decision to proceed with the proposed action is made is to suggest that defendants are free to ignore NEPA in the decision making process. Such a result would frustrate the express purpose of NEPA, which is to insure that federal agencies thoroughly identify and carefully consider all environmental effects of any proposed action prior to making the final decision.[44]

■ The law in this Circuit is that the requirements of § 102(2)(C) of NEPA apply to a proposed action if that action *could* have a significant impact on the environment. *M. P. I. R. G. v. Butz,* 498 F.2d 1314, 1320 (8th Cir. En Banc, 1974).[45] Thus for plaintiffs to

44. The defendant agencies are required by NEPA to take the initiative of considering environmental values at *every distinctive and comprehensive stage of the decision making process. Harlem Valley Transportation Ass'n v. Stafford,* 500 F.2d 328 (2d Cir. 1974).

45. In *M. P. I. R. G. v. Butz* the Eighth Circuit held that the term "major federal action significantly affecting the quality of the human environment" cannot be bifurcated, and

that the appropriate test for triggering the application of § 102(2)(C) is only whether the proposed action has a significant effect on the environment. *M. P. I. R. G. v. Butz,* supra, at 498 F.2d 1321. In any event, the proposed action at issue here involves the permanent change of residence of nearly 10,000 persons and the expenditure by the federal defendants of more than ten million dollars. This action qualifies as "major federal action."

show that the proposed action is a major federal action significantly affecting the quality of the human environment, plaintiffs need only show that the proposed action could significantly affect the quality of the human environment in some regard. *M. P. I. R. G. v. Butz,* supra; *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir. 1973). In this regard, the language of the Court in *Scherr v. Volpe* is particularly compelling:

"The defendants' argument in this respect proceeds from the premise that even though there be a clear violation of the Act, even though, as the district court stated, the responsible federal agency failed to 'assemble all pertinent information, to subject it to expert scrutiny and to articulate clearly and in writing an evaluation of the various benefits and costs which are being balanced', that no judicial relief may be afforded the plaintiffs absent a showing on their part that the project would be damaging to the environment. We think the district court's rejection of this theory is particularly relevant: "to suggest that when the federal agencies flatly fail to perform this function, a plaintiff in a lawsuit such as this suit must perform it as a condition to obtaining injunctive relief is to suggest that one of the central purposes of the Act be frustrated." To accept the defendants' argument on this point would thwart the Congressional mandate by rendering impotent the procedural requirements of the National Environmental Policy Act of 1969. What this argument attempts to do is to shift the burdens of considering and evaluating the environmental consequences of particular federal actions from the agencies Congress intended to bear them to the public, the beneficiary of this legislation. If these agencies were permitted to avoid their responsibilities under the Act until an individual citizen, who possesses vastly inferior resources, could demonstrate environmental harm, reconsideration at that

time by the responsible federal agency would indeed be a hollow gesture." *Scherr v. Volpe,* 466 F.2d 1027, 1034 (7th Cir. 1972).

This Court is satisfied that plaintiffs have made the requisite showing that defendants' proposed action could significantly affect the quality of the human environment. As more particularly set forth supra at pp. 235–237, plaintiffs have shown that the proposed transfer from the RGAFB area of approximately 7,500 persons could and will result in significant impacts to the RGAFB area on, among other things, existing social and economic activities and conditions in the area; problems relating to law enforcement and fire prevention; growth and development patterns in the area, including existing land use patterns, and neighborhood character and cohesiveness, etc.; and aesthetic considerations. With regard to the Scott area, as particularized *supra* pp. 237–239, plaintiffs have demonstrated that the proposed relocation of approximately 10,000 persons to that area could result in significant impacts on that area, including *inter alia* impacts on the availability of housing, and the overburdening of local utilities and other public services. Further, the proposed action will result in unknown, but potentially significant, environmental impacts caused by the construction of new housing and other community facilities in the Scott area which will be built to accommodate the incoming population.

While most of these potential impacts may properly be termed "secondary" impacts, they are within NEPA's ambit. See CEQ Guideline 1500.8(a)(3)(ii), 40 C.F.R. § 1500.8(a)(3)(ii) (1974), and the discussion of the scope of NEPA *supra* at pp. 244–246. Where such impacts may be significant, § 102(2)(C) of NEPA applies to the proposed action, including its requirement of the preparation of a detailed EIS by the defendant agencies. Thus, under the teachings of *M. P. I. R. G. v. Butz, supra,* defendants' proposed action must be considered a "major federal action significantly af-

fecting the quality of the human environment" within the meaning of § 102(2)(C) of NEPA. The decision of defendants to effect the relocations, realignments and transfers of Headquarters, AFCS, the ETAC and DCA units, and the Squadron of C–130 aircraft to Scott Air Force Base will be set aside. Defendants will be directed to specifically comply with the requirements of § 102(2)(C) of NEPA, including the requirement that an EIS be prepared and filed, prior to and as an integral part of any reconsideration by the defendant agencies of the decision to effect these realignments, transfers, and relocations to Scott.[46] An appropriate injunctive order will be entered.[47] Judgment shall enter accordingly.

It is so ordered.

### JUDGMENT

Pursuant to the "Findings and Opinion" issued by the Court this date, and for the reasons stated therein, it is hereby

Ordered, Declared, Adjudged, and Decreed that the proposed action of the defendants, namely the proposed realignment and relocation of Headquarters, Air Forces Communications Service, presently located at Richards-Gebaur Air Force Base, Missouri; the Environmental Technical Applications Center, presently located near Washington, D. C.; The Defense Communications Agency, Western Hemisphere, presently located at Fort Carson, Colorado; and the 37th Tactical Airlift Squadron, presently located at Langley Air Force Base, Virginia; to Scott Air Force Base, Illinois, constitutes a major federal action significantly affecting the quality of the human environment within the meaning of § 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C). Accordingly, it is further

Ordered, Declared, Adjudged, and Decreed that defendants have the duty, prior to making the final decision to effect the proposed action, to prepare and file a detailed statement on the environmental impact of the proposed action, and to otherwise comply with the requirements of § 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C). And it is further

Ordered, Adjudged, and Decreed that the decision of the defendants to effect the proposed action be and hereby is vacated, set aside, and held for naught,

---

46. This decision should come as no surprise to the defendants. DODD 6050.1 specifically indicates that the proposed action of defendants may be a major federal action significantly affecting the quality of the human environment, *especially* where secondary socio-economic impacts are concerned. 32 C. F.R. § 214.7(b)(2). The applicable USAF regulation requires that a candidate EIS be prepared for mission changes and troop deployments that precipitate long-term population increases or decreases that may tax the capability of the civilian community, particularly with regard to secondary socio-economic impacts. AFR 19–2, Attachment 1, § 4(i) (22 Nov. 1974).

Additionally, in January of 1975, after the final decision to effect the proposed action had been made and announced, an Assistant Secretary of the Air Force requested the USAF general counsel to advise him of the Air Force chances of success should a suit be brought challenging this action, among others, on NEPA grounds. In response to this request, defendants were specifically advised by their counsel that in all probability a plaintiff would be successful in such a suit, for various reasons, including that the analysis and reasoning done in reaching the decision that no EIS was needed was extremely limited and "so superficial that, . . . a court would find any decision on the actions assessed to lack procedural compliance with NEPA." See Plaintiffs' Exhibit 19. In short, defendants were advised well in advance of this litigation that in the opinion of their own counsel the Air Force had failed to comply with the dictates of NEPA. If not before, Chief of Staff Jones was made aware of this opinion in March of 1975.

47. The injunction will terminate upon the filing of the final EIS. Any challenge to the adequacy of the EIS or to the final decision that is made will require the institution of a separate proceeding. *M. P. I. R. G. v. Butz, supra,* 498 F.2d at 1325 n. 32.

and defendants, individually and collectively, are hereby enjoined and prohibited from effecting the proposed action, or from considering whether to effect the proposed action, until such time as defendants specifically comply, to the fullest extent possible, with the requirements of § 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C), in that defendants shall prepare, or cause to be prepared, a detailed statement on

> (i) the environmental impact of the proposed action,

> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

> (iii) alternatives to the proposed action,

> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code (5 USC § 552) and shall accompany the proposal through the existing agency review processes.

And it is further

Ordered that judgment shall be, and hereby is, entered in favor of plaintiffs and against defendants. The costs of this action are taxed against the defendants.

## MEMORANDUM AND ORDER

■ On June 19, 1975, this Court entered its findings, opinion, and injunctive order prohibiting the defendants from effecting the proposed transfers of Headquarters, Air Force Communications Service (AFCS) presently located at Richards-Gebaur Air Force Base, Missouri; the Environmental Technical Applications Center (ETAC) presently located in Washington, D. C.; The Defense Communications Agency, Western Hemisphere (DCA) presently located at Fort Carson, Colorado; and the 37th Tactical Airlift Squadron (TAS), presently located at Langley Air Force Base, Virginia; to Scott Air Force Base, Illinois until such time as defendants complied with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970) (NEPA). Specifically, this Court found that the proposed realignments, relocations and transfers of these units to Scott Air Force Base constituted a "major federal action significantly affecting the quality of the human environment" within the meaning of § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). Thus, the proposed realignments, relocations and transfers were enjoined until such time as the defendants prepare and file an environmental impact statement (EIS) on the proposed relocations, realignments, and transfers in strict compliance with the provisions of § 102(2)(C) of NEPA.

This matter is presently before the Court to consider the motion of defendants for partial dissolution of that injunction. Specifically, defendants request that the injunction be dissolved with respect to the ETAC and DCA units because (1) these units were not part of the package decision to transfer the AFCS and TAS units to Scott Air Force Base and (2) the national security of the United States will be impaired if the injunction is not lifted with respect to the ETAC unit. Plaintiffs have opposed this motion.

A full evidentiary hearing was held on defendants' motion on July 7, 1975. Based upon the evidence adduced at that hearing, and upon the facts as found by the Court in its Findings and Opinion entered after the trial of this cause on the merits, and for the reasons set forth below, defendants' motion will be sustained.

## I.

Initially, this Court must express its surprise at the raising by defendants of the contention that the national security of the United States will be impaired by the enjoining of the relocation of ETAC to Scott Air Force Base. On at least two previous occasions in informal conferences the defendants were requested to advise the Court if the national security of the United States could be affected in any way by this litigation. On both occasions this court was advised that national security would not be an issue in this case. Further, at no time during the two week trial was it ever suggested by defendants that the national security could be affected by this litigation.

As defendants have now raised this issue with respect to the ETAC unit, this Court cannot, in the exercise of good conscience, ignore the contention that the national security will be substantially impaired if the relocation of the ETAC unit is not permitted to proceed as previously scheduled. This Court does strongly suggest, however, that in the future the defendants undertake to advise courts of potential effects of litigation on any aspect of national security at the earliest possible time, and certainly well before the trial of the case and the issuance of the final judgment.[48]

At the hearing ETAC's commander testified that one of ETAC's functions is to provide weather support information for various branches of the Air Force and other services on a worldwide basis in time of crisis and potential war situations. He testified that in order to carry out this mission, and in order to more efficiently carry out the remainder of ETAC's operation, a new computer had been installed at Scott Air Force Base that would be operational on October 31, 1975, the planned date of final relocation of ETAC to Scott. In the opinion of ETAC's commander, ETAC may be unable to carry out its support mission in crisis situations at the level of efficiency needed until the new computer is operational. Finally, it is his opinion that if the injunction is not lifted with respect to ETAC, it will be necessary to move the new computer to Washington, D.C., delaying the date it would be operational until sometime in February, 1976, or later. In this regard plaintiffs adduced the testimony of a senior civilian employee of ETAC that, in his opinion, ETAC was able presently to function at the required level of efficiency in crisis situations.

In view of this evidence, it is the conclusion of this Court that if the injunction is not lifted as to ETAC the ability of ETAC to perform a necessary national security function may be impaired in the time period beginning October 31, 1975, to February or March, 1976.[49]

---

48. Defendants have suggested that prior to the issuance of the findings and opinion, and the final injunctive order, they were unaware that ETAC was a part of this litigation, and for that reason did not advise the Court of the potential national security aspects of this litigation with regard to ETAC. This Court is somewhat mystified by this assertion. First, the complaint specifically refers to the ETAC unit's transfer to Scott. Second, as concerned potential environmental impacts at the Scott area, the entire trial consisted of evidence relating to the impacts of all DOD personnel being relocated to Scott, including ETAC. Third, after the trial and two weeks before the entry of the final judgment, this Court entered a preliminary injunction specifically enjoining the ETAC move. Defendants thereupon moved to amend the preliminary injunction so as to permit the ETAC move (and the DCA move) to be made, but this motion did not suggest that national security was in any way involved.

49. Plaintiffs have suggested that the national security contention raised by defendants is not a valid consideration, and merely represents an attempt by the defendants to es-

That conclusion therefore must be taken into consideration in determining whether the planned relocation of ETAC to Scott Air Force Base should be enjoined on NEPA grounds.

## II.

Defendants' other contention in support of their motion to dissolve the injunction with regard to ETAC and DCA is that these units were not part of the decision to transfer AFCS and the 37th TAS to Scott, and therefore should not be enjoined in conjunction with these moves. In this regard defendants suggest that the decision to relocate ETAC to Scott was made in April of 1974, the decision to relocate DCA to Scott was made in January of 1975, and that neither of these relocations was made in conjunction with or in any way related to the moves of AFCS and the 37th TAS to Scott, which were announced November 22, 1974. Defendants further suggest that the ETAC move, consisting of approximately 122 job positions, and the DCA move, consisting of approximately 28 job positions, would have a de minimus environmental impact, and that therefore the injunction should be modified as necessary to permit defendants to effect the relocations of ETAC and DCA to Scott "to the extent deemed appropriate following evaluation of the environmental impact thereof in accordance with the provisions of NEPA".

This Court cannot accept defendants contention that the ETAC and DCA moves must be considered as separate and distinct from the AFCS and 37th TAS relocations for NEPA purposes. The evidence at trial clearly established that the defendants, which include not only the United States Air Force, the Secretary of the Air Force, and the Air Force Chief of Staff but also the Department of Defense and the Secretary of Defense, decided to accomplish the transfer of four units to Scott Air Force Base within a narrow time period, to be coordinated with units and functions already located at that installation. To consider the relocations of each of these units as separate and distinct for NEPA purposes, from the other planned relocations would be to ignore the fact that the overall impact on the area surrounding Scott Air Force Base of these relocations can only be measured in terms of all units and personnel being transferred to that base within the narrow time period involved.

However, as previously noted, the DCA move only involves some 28 job authorizations, and the ETAC relocation only involves some 122 job authorizations. Thus, the relocations of personnel involved in the transfers of these two units only concern some 150 of the nearly 3,000 job positions that defendants plan to transfer to Scott. The evidence adduced at trial does not support the conclusion that the transfer of these two units, standing alone or in conjunction with one another but divorced from the planned relocations of AFCS and the 37th TAS, could have a significant effect on the quality of the human environment in the Scott Air Force Base area.[50]

## III.

In view of these considerations, it is the opinion of this Court that the injunction should be lifted insofar as it applies to the ETAC and DCA relocations. Clearly, in the overall context of the relocations of AFCS, 37th TAS, ETAC, and DCA to Scott Air Force Base, the transfer of the 28 job positions which make up the DCA relocation can fairly be considered to be de mini-

cape the effect of the injunction by, in essence, clouding the issues. While this Court appreciates the reasons why plaintiffs have evidently reached this conclusion, this Court is not prepared, on the basis of the evidence adduced, to conclude that this contention is baseless and made in bad faith.

50. It is worth note that plaintiffs have never contended that defendants failed to comply with NEPA in studying the potential impacts of the ETAC and DCA relocations on the areas from which they are moving.

mus. Further, in view of the small size of the ETAC relocation (even when coupled with the DCA relocation), it is this Court's opinion that the potential damaging effects on the national security that could result from the injunction continuing in effect as to ETAC warrant the injunction being dissolved as to the ETAC relocation.

In making this determination, this Court does not suggest that NEPA is inapplicable to these relocations. Indeed, as a condition to the lifting of the injunction as to the planned relocation of these two units defendants are required to independently reassess the environmental impact of these proposed relocations, prior to making the final decisions to effect these transfers. Defendants admitted that they would be required to conduct such evaluations in their motion for partial dissolution of the injunction. Further, it is clear that an EIS on the relocations of AFCS and the 37th TAS will of necessity need to evaluate and consider the fact that ETAC and DCA, should defendants finally decide to effect those transfers, will relocate to Scott Air Force Base, and that the ability of the Scott Air Force Base Area to absorb the AFCS and 37th TAS personnel will be decreased to the extent that the DCA and ETAC personnel will move into the area.

Accordingly, for the reasons previously stated, it is hereby

Ordered that the injunction issued in this cause on June 19, 1975, insofar as it pertained to the planned relocations of ETAC and DCA to Scott Air Force Base, Illinois, be and hereby is dissolved, but in all other respects the injunction shall remain in full force and effect.